Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


★ ★ ★  ★ ★ ★

## MEMORANDUM OPINION

No. 04-11-00165-CV

**IN THE INTEREST OF J.A.M., JR.**, a Child

From the 38th Judicial District Court, Uvalde County, Texas
Trial Court No. 2010-03-27,480-CV
The Honorable Cathy O. Morris, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:    Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice
Rebecca Simmons, Justice

Delivered and Filed:   May 9, 2012

AFFIRMED

Desiree[1] appeals the termination of her parental rights to her child, J.A.M., Jr.  Having

now reviewed the entire record, we conclude that Desiree has failed to establish that any of her

appellate issues warrant reversal.  We, therefore, affirm the trial court's judgment terminating

Desiree's parental rights.

### FACTUAL AND PROCEDURAL BACKGROUND

J.A.M., Jr. was born on December 21, 2009 to 19-year old parents Desiree and Joel, a

young married couple.  On the morning of March 2, 2010, when the child was ten weeks old,

Desiree and Joel took J.A.M, Jr. to the emergency room at Uvalde Memorial Hospital, stating

that the child had been crying a lot for about a day and a half; they also told the doctor that

---

[1] In accordance with TEX. R. APP. P. 9.8(b), we refer to the parents of the minor child by their first names only.

J.A.M., Jr.'s left leg was swollen and he had not been moving it. Desiree and Joel did not know why the child's leg was swollen. The emergency room physician, Dr. David Blackburn, did not see any bruises on J.A.M., Jr. Dr. Blackburn examined J.A.M., Jr.'s left leg and found it swollen and tender. X-rays revealed that J.A.M., Jr. had two distal, or "corner," fractures in his left leg— one near his ankle (distal tibia fracture) and one near his knee (distal femur fracture). Dr. Blackburn stated that such fractures in an infant under six months of age are not common, and are "very suspicious" for non-accidental trauma, such as violent or fast grabbing of the child involving twisting or jerking, or hyper-flexion of the joint. Dr. Blackburn also stated that such distal fractures could occur in a child with bone disease. Dr. Blackburn stated the fractures appeared to be new because there was soft tissue swelling and no new bone formation. After consulting with J.A.M., Jr.'s doctor, Dr. Kevin Uptergrove, Dr. Blackburn transferred J.A.M., Jr. to Santa Rosa Children's Hospital in San Antonio for a complete work-up, including more x-rays, blood work, a complete skeletal study, and a head CT scan. Dr. Blackburn felt that J.A.M., Jr. needed further evaluation to rule out any type of bone disease, although his bones appeared healthy on the x-ray he viewed.

At Santa Rosa Children's Hospital, J.A.M., Jr. was examined by Dr. James Lukefahr, a pediatrician and medical director of San Rosa's child abuse center. A skeletal survey performed on J.A.M., Jr. on the evening of March 2 showed two healing rib fractures and eight to ten healing corner fractures on the child's wrists, knees, and ankles. J.A.M., Jr.'s blood tests did not reveal any abnormalities. The Department of Family and Protective Services (the "Department") was called in to investigate and, on March 3, 2010, the Department filed an emergency petition to remove J.A.M., Jr. from his parents' care; the Department was appointed temporary managing conservator of J.A.M., Jr. that day due to the aggravating circumstances. After an investigation

of the suspected physical abuse, the Department initiated termination proceedings against both parents.

On the first day of trial, Joel decided to voluntarily relinquish his parental rights to J.A.M., Jr. pursuant to a Rule 11 agreement in which the Department agreed to expedite consideration of placement of J.A.M., Jr. with his paternal grandmother. Desiree proceeded to a jury trial. At trial, the Department presented the testimony of two medical experts: Dr. Blackburn, the Uvalde Hospital ER physician, and Dr. Lukefahr, the treating pediatrician and child abuse expert at Santa Rosa. In addition, the Department's investigator and J.A.M., Jr.'s case worker testified about the Department's investigation, and J.A.M., Jr.'s foster mother testified that he was a normal healthy infant and had suffered no further fractures since his placement with her in October 2010. Finally, a Uvalde deputy sheriff testified that he conducted a criminal investigation that led to the indictment of Desiree and Joel for injury to a child. There was no eyewitness testimony, or other direct evidence, that either parent had ever physically abused J.A.M., Jr. The evidence of physical abuse came from J.A.M., Jr.'s medical records and the expert medical opinions.

Dr. Lukefahr was the main witness for the Department. He testified that the initial skeletal survey taken on March 2 showed that J.A.M., Jr. had two healing rib fractures (lateral and posterior), which would be caused by squeezing of the chest, and eight to ten healing corner, or distal, fractures of his wrists, knees, and ankles, which would be caused by "forceful twisting and jerking" of the arms and legs. Dr. Lukefahr stated that child abuse of small infants typically results in these types of fractures. He testified that the skeletal survey and blood tests he ran ruled out any type of bone disease as the cause of J.A.M., Jr.'s fractures. Specifically, Dr. Lukefahr stated that his tests ruled out osteopenia, which is related to a calcium or mineral

deficiency, metabolic bone disease or rickets, which results from a vitamin D deficiency, osteogenesis imperfecta or brittle bone disease, which has a different appearance and manifests in different locations than JA.M., Jr.'s fractures, and other rare genetic conditions. Dr. Lukefahr testified that, based on the x-rays, J.A.M., Jr. has "really healthy bones," and stated his opinion that there was no other possible explanation for J.A.M., Jr.'s physical injuries other than child abuse, and the fractures on J.A.M., Jr. could not be the result of a nurse's handling during immunizations or measurement. Dr. Lukefahr explained the appearance of some additional fractures on a follow-up skeletal survey taken on March 18, by stating that a fracture on such a small infant does not show up immediately on an x-ray because the ends of an infant's bones are really still cartilage; "it's not until some healing starts taking place that the body starts depositing calcium on the area that it becomes visible on the x-ray." Dr. Lukefahr stated he was "very confident" the new fractures did not occur after March 2, but were simply not far enough along in the healing process to show up on the March 2 x-rays.

Desiree consistently denied that either she or Joel had hurt J.A.M., Jr., but could not explain how he had suffered the multiple fractures. Desiree testified about her pregnancy and J.A.M., Jr.'s vacuum-assisted delivery and temperature of 104 degrees at birth. Desiree detailed the many times she had taken J.A.M., Jr. to the family doctor or to the emergency room, and expressed her belief that something was wrong with him. During the 10 weeks after his birth, Desiree took J.A.M., Jr. to the family doctor, Dr. Uptergrove, on: (1) December 24, 2009 for jaundice; (2) December 28, 2009 because Desiree felt he was "breathing way too hard;" (3) January 18, 2010 for his one-month check-up and immunizations; (4) January 22, 2010 because Desiree had seen purple marks on the inside of J.A.M., Jr.'s hands and between his toes; Dr. Uptergrove ordered blood tests which were normal; and (5) on February 25, 2010 for his two-

month check-up and immunizations. In addition, Desiree took J.A.M., Jr. to the Uvalde Memorial Hospital emergency room several times: (1) on January 1, 2010, for a cough and constipation; (2) on January 13, 2010 for thrush; (3) on February 9, 2010 for being "fussy" and vomiting; Dr. Blackburn noted a rash but no bruises or swelling, and gave Desiree medicine for colic; (4) on February 11, 2010, for phlegm and blood in his vomit; Dr. Blackburn ordered x-rays of J.A.M., Jr.'s upper GI tract which were normal; and (5) on March 2, 2010, for continued crying and swelling in his left leg. Desiree testified that she was always taking J.A.M., Jr. to the hospital because she thought there was something wrong with him, and they would just send her home. Desiree stated that she and Joel were the sole caregivers for J.A.M., Jr. at all times. Desiree believed that when J.A.M., Jr. received his last set of immunizations, the nurse held his legs down and that could have caused the fractures.

Desiree's defense theory was that J.A.M., Jr. had a bone disease, and her attorney cross-examined the Department's medical experts about the various types of bone diseases and the tests used to detect or rule them out. Desiree called Dr. Uptergrove and his Nurse Practitioner Rebecca Leggett as defense witnesses. Dr. Uptergrove testified that Desiree had a normal delivery, although it was a prolonged labor over 20 hours, antibiotics for Group B Strep were given, J.A.M., Jr.'s scalp had swelling during the delivery; within an hour after birth, J.A.M., Jr. had a normal temperature. Dr. Uptergrove also testified to the times he had seen J.A.M., Jr. since his birth, stating that in late January 2010 some ecchymosis, or bruising, had been observed and lab tests were run on J.A.M., Jr.; Dr. Uptergrove also referred the child to a pediatric hematologist, but he did not recall receiving any follow-up information. No one in his office raised any concern about J.A.M., Jr. having a bone disease. At the time, Dr. Uptergrove did not suspect the parents of any child abuse, but he testified he now concurred with Dr. Lukefahr's

conclusion of child abuse. Rebecca Leggett testified that she worked with Dr. Uptergrove and also in the Uvalde Hospital emergency room; she saw J.A.M., Jr. for thrush, and she noticed petechia, little pin point dots, on his hands, but his blood work came back normal; she did not suspect the parents of child abuse at the time.

In her testimony Desiree referred to a medical expert hired by her and Joel who was of the opinion that J.A.M., Jr. likely had a metabolic bone disease. Desiree was not permitted to present the testimony of the defense expert, Dr. Marvin Miller, an expert in pediatric bone disease, because she had failed to designate him as a witness independently of Joel's witnesses; Dr. Miller was included on Joel's list of witnesses filed prior to trial. Dr. Miller's report was based on his review of J.A.M., Jr.'s medical records and x-rays, the medical and pregnancy history provided by the family, the opinion of a radiologist who reviewed the x-rays, and his review of Dr. Lukefahr's report. Dr. Miller concluded that there was another explanation for J.A.M., Jr.'s fractures, particularly in light of the additional fractures found on March 18 after he was removed from the parents' care; his opinion was that "to a reasonable degree of medical certainty . . . it is highly unlikely that the fractures/bone irregularities in [J.A.M., Jr.] were from child abuse. . . it is far more likely that he had metabolic bone disease of infancy related to maternal vitamin D deficiency and decreased fetal bone loading."

At the conclusion of the trial, the jury found that Desiree had allowed J.A.M., Jr. to remain in an endangering environment and had engaged in conduct that endangered J.A.M., Jr.'s physical or emotional well-being; the jury also found it was in the child's best interest for Desiree's parental rights to be terminated and conservatorship to be granted to the Department. *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), (E), (2) (West Supp. 2011). On February 16, 2011, the trial court signed a final order adopting the jury's findings and terminating Desiree's parental

rights to J.A.M., Jr. Desiree filed a motion for new trial and statement of appellate points asserting the court erred in excluding Dr. Miller's testimony concerning the cause of the child's broken bones and alleging other trial errors, including ineffective assistance of counsel. *See id.* at § 263.405(b) (West 2008).[2] After the motion for new trial hearing, the court denied Desiree's request for a new trial and found her appellate issues frivolous. *See id.* at § 263.405(d) (West 2008). Desiree appealed.

On July 27, 2011, this court issued a memorandum opinion in which it stated, in relevant part, that it was unable to determine, based solely on the clerk's record and motion for new trial hearing, whether Desiree's appellate issues were frivolous; therefore, we ordered preparation of the full reporter's record and re-briefing by the parties on the merits of Desiree's appellate issues. *In re J.A.M., Jr.*, No. 04-11-00165-CV, 2011 WL 3122535, at *2-3 (Tex. App.—San Antonio July 27, 2011, order) (mem. op.); TEX. FAM. CODE ANN. § 263.405(g) (West 2008). Having the benefit of the full record, we now proceed to address the merits of Desiree's appellate issues. We begin with Desiree's issue concerning exclusion of Dr. Miller's testimony.

## EXCLUSION OF EXPERT TESTIMONY

Desiree asserts the trial court abused its discretion in excluding the testimony of Dr. Marvin E. Miller, an expert on bone disease in infants, because of her failure to designate Dr. Miller as a witness independently from the father, Joel. *See Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (trial court's rulings admitting or excluding evidence are reviewed for abuse of discretion). A trial court abuses its discretion when it rules without regard for any guiding rules or principles, or acts arbitrarily or unreasonably. *City of Brownsville v.*

---

[2] Section 263.405 was amended by the 82nd Leg., R.S., ch. 75, §§ 4, 5, which became effective on September 1, 2011. However, because the final order of termination in this case was rendered prior to September 1, 2011, this case is governed by the prior version of section 263.405 in effect on the date of the final order. *See id.* Therefore, all references to section 263.405 in this opinion will be to the version in effect immediately prior to September 1, 2011.

*Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Here, the trial court ruled that Desiree could not adopt Joel's witness list during the middle of trial, and, because Desiree failed to designate Dr. Miller as one of her witnesses, he would not be permitted to testify on her behalf. On appeal, the Department argues this issue is without merit because Desiree did not argue to the trial court that Dr. Miller should testify under the "no unfair surprise" exception to exclusion of an undesignated witness, as she now argues on appeal. *See* TEX. R. CIV. P. 193.6(a); TEX. R. APP. P. 33.1(a).

The record shows that Joel timely designated Dr. Miller on his witness list by the February 1, 2011 deadline set in the trial court's pre-trial scheduling order; Dr. Miller's curriculum vitae and report, however, were not filed by Joel until the morning of trial.[3] Prior to trial, the court entered an order ruling that Dr. Miller would be permitted to testify telephonically or via video during trial; the written order recites that the motion to authorize Dr. Miller to testify telephonically was presented to the court on February 1, 2011, but the order was not filed until the morning of February 14, 2011, the first day of trial. Desiree did not file her own separate witness list before trial; however, there are references on the record by both parties to a witness list filed by Desiree during trial which attempted to adopt Joel's designation of Dr. Miller.[4]

Rule 193.6(a) of the Texas Rules of Civil Procedure requires the exclusion of the testimony of a witness who was not timely identified, unless the court finds that the party had good cause for failing to disclose the witness, or that the failure to timely disclose the witness

---

[3] In his supplemental list of exhibits filed on February 8, 2011, Joel acknowledged that Dr. Miller's resume and report had not yet been produced, and stated they would be provided as soon as they were received from Dr. Miller.

[4] Desiree's witness list does not appear in the appellate record.

will not unfairly surprise or unfairly prejudice the other party. TEX. R. CIV. P. 193.6(a). The rule requiring that witnesses be disclosed in discovery is mandatory, and the penalty of exclusion for failure to comply is automatic absent a showing of good cause, or lack of unfair surprise or unfair prejudice. *Good v. Baker*, 339 S.W.3d 260, 271 (Tex. App.—Texarkana 2011, pet. denied). On appeal, Desiree argues only the second aspect of the Rule's exception: the lack of unfair surprise or unfair prejudice to the Department. TEX. R. CIV. P. 193.6(a)(2). The proponent of the evidence bears the burden of establishing the lack of unfair surprise or prejudice, and the record must support a finding on the lack of unfair surprise or prejudice. *Good*, 339 S.W.3d at 271; TEX. R. CIV. P. 193.6(b).

Desiree asserts the Department would not have been unfairly surprised or prejudiced if she had been permitted to call Dr. Miller to testify at trial because prior to trial her co-party, Joel, timely designated Dr. Miller as an expert witness and filed his resume and report, and the court ruled that Dr. Miller could testify telephonically; therefore, the Department had knowledge of Dr. Miller's identity and qualifications, and the contents of his report prior to the commencement of trial. *See* TEX. R. CIV. P. 193.6(a)(2). However, Desiree's trial counsel did not raise this argument in the trial court. Her counsel merely conceded that she "screwed up" by relying on Joel's designation of Dr. Miller – she made no argument that Dr. Miller's testimony should nevertheless be permitted based on lack of surprise under Rule 193.6(a) or any other authority; thus, she did not preserve the issue. *See* TEX. R. APP. P. 33.1(a). Moreover, where, as here, the trial court applies Rule 193.6's principle of automatic exclusion to an undesignated witness, and no basis for applying an exception is argued to the court, we cannot say the court abuses its discretion in following the rule's mandate. *Downer*, 701 S.W.2d at 241-42; *Fort Brown Villas III Condominium Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 881-82 (Tex. 2009) (trial court's

exclusion of expert who has not been properly designated can be overturned only upon a finding of abuse of discretion); *see also Total Clean, LLC v. Cox Smith Matthews, Inc.*, 330 S.W.3d 657, 663-64 (Tex. App.—San Antonio 2010, pet. denied).

In her brief, Desiree makes an additional argument that exclusion of Dr. Miller's testimony amounted to an unjust "death penalty sanction" because it precluded her from presenting evidence on the merits of her case. *See* TEX. R. CIV. P. 215.2 (addressing sanctions for discovery abuse); *see also Sells v. Drott*, 330 S.W.3d 696, 704 (Tex. App.—Tyler 2010, pet. denied) (discovery sanctions that are so severe they preclude presentation of the merits of a party's case should not be imposed absent a party's flagrant bad faith or counsel's callous disregard for the discovery rules). The record does not support Desiree's argument, as there is no indication that the trial court intended the exclusion of Dr. Miller as a sanction for discovery abuse. The court's ruling was limited to denial of Desiree's request to adopt Joel's witness list and exclusion of Dr. Miller's testimony based on Desiree's failure to designate him as one of her witnesses. The exclusion of a witness under Rule 193.6(a) based on an untimely designation is a matter of admissibility rather than a sanction for discovery abuse under Rule 215.2. *White v. Browning*, No. 03-04-00273-CV, 2006 WL 151980, at *5 (Tex. App.—Austin Jan. 19, 2006, pet. denied) (mem. op.); *see Kernan v. Cratty*, No. 14-00-00865-CV, 2001 WL 1136153, at *2 (Tex. App.—Houston [14th Dist.] Sept. 27, 2001, no pet.) (not designated for publication).

We conclude Desiree has not established an abuse of discretion by the trial court in excluding Dr. Miller's testimony as an undesignated witness.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Desiree also raises several grounds of alleged ineffective assistance by her trial counsel: (1) failing to designate Dr. Miller as a witness for Desiree; (2) failing to designate several fact

witnesses who could testify concerning Desiree's good care of J.A.M., Jr.; (3) failing to object to admission of the pending indictment against Desiree for injury to a child, and to request a limiting instruction that an indictment is not evidence of guilt; and (4) failing to object to a police officer's opinion testimony that J.A.M., Jr. had been physically abused, that Desiree had committed a criminal offense, there was sufficient cause for her to be indicted, and the indictment was "a ruling" from the grand jury. The Department asserts that Desiree has failed to present sufficient record cites, argument and analysis to establish either *Strickland* prong.

An indigent parent in a parental termination case has the right to effective assistance of counsel, and the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), applied in the criminal law context has been adopted as the appropriate standard in termination cases. *In re M.S.*, 115 S.W.3d 534, 544-45 (Tex. 2003). To prevail on an ineffective assistance claim, an appellant must prove both *Strickland* prongs, establishing that counsel's performance was deficient and that counsel's errors prejudiced the appellant by depriving her of a fair trial whose result is reliable. *Id.* at 545 (citing *Strickland*, 466 U.S. at 687). Failure to prove either prong of the *Strickland* test will defeat an ineffective assistance claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Walker v. Tex. Dept. of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

To establish deficient performance, an appellant must show that counsel's performance fell below an objective standard of reasonableness and rebut the presumption that counsel's decisions were based on trial strategy. *In re M.S.*, 115 S.W.3d at 545, 549; *In re J.O.A.*, 283 S.W.3d 336, 343 (Tex. 2009); *see Thompson*, 9 S.W.3d at 812-13. The appellant must provide a sufficient record that affirmatively demonstrates ineffective assistance and overcomes the strong presumption that counsel's conduct fell within the wide range of reasonable professional

assistance, including the possibility that counsel's actions were strategic. *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006); *Thompson*, 9 S.W.3d at 813; *Walker*, 312 S.W.3d at 623-24. In evaluating counsel's performance, the court does not focus on isolated acts or omissions, but considers all the circumstances surrounding the case and focuses primarily on whether counsel performed in a "reasonably effective" manner. *In re M.S.*, 115 S.W.3d at 545. "It is only when 'the conduct was so outrageous that no competent attorney would have engaged in it,' that the challenged conduct will constitute ineffective assistance." *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

Proof that counsel's deficient performance prejudiced the appellant's defense requires a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-88, 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). A mere showing that counsel's error had some conceivable effect on the proceedings is inadequate, as the burden is to show a "reasonable probability" that the result of the proceeding would have been different. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996). The right to reasonably effective counsel does not mean the right to "errorless or perfect counsel." *Badillo v. State*, 255 S.W.3d 125, 129 (Tex. App.—San Antonio 2008, no pet.) (quoting *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990)).

Here, Desiree alleged ineffective assistance in her motion for new trial and as one of her appellate points, but did not call her trial counsel to testify at the motion for new trial hearing. Therefore, there is no evidence in the record about the reasons, or lack of reasons, underlying counsel's decisions. The courts have repeatedly recognized the difficult task of establishing

ineffective assistance on direct appeal based solely on the trial record. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (absent specific explanations for counsel's decisions, record on direct appeal will rarely contain sufficient information to evaluate an ineffective assistance claim); *see also Garcia*, 57 S.W.3d at 440 (in the absence of evidence of counsel's reasons for the challenged conduct, the court "commonly will assume a strategic motivation if any can possibly be imagined," and will not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it"). With the exception of counsel's failure to designate Dr. Miller, which is addressed below, Desiree presents no argument and cites to nothing in the record that would rebut the strong presumption that counsel's challenged decisions were strategic and that her conduct fell within the wide range of objectively reasonable assistance. "When the record is silent as to the reasons for counsel's conduct, a finding that counsel was ineffective would require impermissible speculation by the appellate court." *Johnson v. State*, 233 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *see also In re V.G.*, No. 04-08-00522-CV, 2009 WL 2767040, at *13-14 (Tex. App.—San Antonio Aug. 31, 2009, no pet.) (mem. op.). Due to the lack of evidence in the record regarding counsel's reasons for not designating the purported fact witnesses or objecting to the challenged evidence, Desiree has failed to rebut the presumption these decisions were strategic; therefore, we cannot conclude that counsel's performance was deficient in these areas. *See Walker*, 312 S.W.3d at 623.

Finally, with respect to Desiree's last ground concerning designation of Dr. Miller as a witness for Desiree, the record does affirmatively show that her attorney admitted making a mistake by relying on Joel's designation of Dr. Miller, and by failing to separately designate Dr. Miller as an expert witness for Desiree; further, counsel's comments on the record reveal her

professional opinion that a medical expert was needed to rebut the Department's medical evidence of physical abuse. Even if we assume, however, that counsel's failure to designate Dr. Miller constituted deficient performance, Desiree must establish the second *Strickland* prong – that there is a "reasonable probability," not merely a possibility, that the outcome of the trial would have been different absent counsel's error. *See Strickland*, 466 U.S. at 687-88. Based on this record, Desiree has failed to meet her burden to show prejudice.

Desiree's prejudice argument in her brief is merely conclusory, simply stating that Dr. Miller's testimony was crucial because the Department's entire case was based on the expert opinion that J.A.M., Jr.'s fractures were the result of child abuse. Desiree does not present any analysis applying the governing principles of law to the evidence in the case in order to affirmatively show that there is a "reasonable probability" the outcome would have been different if Dr. Miller had testified. *See Thomas v. State*, No. 14-06-00540-CR, 2008 WL 596228, at *5 (Tex. App.—Houston [14th Dist.] Mar. 6, 2008, no pet.) (mem. op., not designated for publication). At trial, Desiree's counsel cross-examined Dr. Lukefahr and Dr. Blackburn on the defense theory that J.A.M., Jr.'s multiple fractures were due to bone disease, rather than physical abuse by the parents; thus, the absence of Dr. Miller's testimony did not preclude presentation of Desiree's defense theory. *See Hunter v. Ford Motor Co., Inc.*, 305 S.W.3d 202, 208 (Tex. App.—Waco 2009, no pet.) ("An expert's testimony may be contradicted by the testimony of other witnesses or by cross-examination of the expert witness."). Assuming Dr. Miller would have testified in accordance with his written report that, in his opinion, it is "highly unlikely" that J.A.M., Jr.'s fractures were from child abuse, but were "far more likely [the result of] metabolic bone disease of infancy related to maternal vitamin D deficiency and decreased fetal bone loading," his opinion would have served as a competing expert opinion, subject to

cross-examination, for the jury to consider along with the expert opinions of the Department's witnesses – particularly, the opinion of Dr. Lukefahr who testified that his testing had ruled out any bone disease in J.A.M., Jr.  Desiree's brief provides no analysis demonstrating a "reasonable probability" that Dr. Miller's testimony would have resulted in a different outcome in view of the Department's substantial medical evidence consisting of J.A.M., Jr.'s medical records and x-rays showing multiple bone fractures during the first two to three months of life, the expert testimony by Dr. Lukefahr and Dr. Blackburn, plus the lay testimony of the Department's caseworkers and foster mother that J.A.M., Jr. had suffered no additional fractures after removal, and Desiree's own testimony that she and Joel were the sole caregivers for J.A.M., Jr.  Desiree has failed to establish that, if counsel had designated Dr. Miller as a witness, there is a "reasonable probability" of a different outcome.

## CONCLUSION

Based on the foregoing reasons, we conclude that none of Desiree's appellate issues warrant reversal.  Accordingly, we affirm the trial court's judgment.


Phylis J. Speedlin, Justice